Corabi, Appellant, *v.* Curtis Publishing
Company, Appellant.

434

Argued January 28, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused March 8, 1971.

*Jerome J. Shestack,* with him *Tom P. Monteverde, Robert F. Simone,* and *Schnader, Harrison, Segal & Lewis,* for plaintiff.

*Harold E. Kohn,* with him *David H. Marion,* and *Helen H. Stern,* for defendant.

OPINION BY MR. JUSTICE EAGEN, January 25, 1971:

Lillian Reis Corabi, also known as Lillian Reis, instituted this suit on her own behalf and on behalf of her two daughters, as parent and guardian, seeking damages in five counts from the defendant, Curtis Publishing Company, for publication of an article in the October 26, 1963, issue of the Saturday Evening Post entitled "They Call Me Tiger Lil." The complaint charged the article: (1) constituted unfair competition with Lillian Reis Corabi; (2) was defamatory of Lillian Reis Corabi; (3) invaded the privacy of Lillian Reis Corabi; (4) plagiarized from Lillian Reis Corabi; and (5) invaded the privacy of the two daughters of Lillian Reis Corabi, Barbara and Michael Corabi.

A jury trial resulted in a verdict in favor of the plaintiff and against the defendant in substantial amounts on counts Nos. 1, 2, 3 and 5.

Timely motions were filed by the defendant for judgments notwithstanding the verdict or a new trial. Subsequently, the court en banc below entered judgment for the defendant notwithstanding the verdict on the counts involving Lillian Reis Corabi's claims for unfair competition and invasion of privacy. The court denied the defendant's motion for judgment notwithstanding the verdict on the remaining counts, but ruled that the jury awards in connection therewith were grossly excessive and ordered a new trial, unless remittiturs for specified amounts were filed within thirty days. Proper remittiturs were not filed, and the order granting a new trial prevailed. See 437 Pa. 143, 262 A. 2d 665 (1970).

Defendant, Curtis Publishing Company, filed an appeal (No. 487), and Lillian Reis Corabi filed two cross-

appeals (Nos. 499 and 529). No appeal was filed on behalf of Barbara and Michael Corabi.

APPEAL OF CURTIS PUBLISHING COMPANY
(CURTIS) (No. 487)

The prime issue posed by this appeal is whether or not the lower court erred in refusing to enter judgment for the defendant Curtis notwithstanding the verdict on all claims presented by the plaintiff, particularly the personal claim of Lillian Reis for libel. In this connection, it is asserted that recovery must be denied as a matter of law because: (a) The publication involved was incapable of the interpretation urged by the plaintiff and was not defamatory as a matter of law; (b) The plaintiff, admittedly a public figure, failed to show by clear and convincing evidence either falsity or actual malice, and hence permitting recovery against Curtis under the circumstances would violate its rights guaranteed by the First and Fourteenth Amendments to the Constitution of the United States.

Before reaching the prime issue a discussion of our scope of review is necessary. As noted before, Curtis moved both for judgment n.o.v. and a new trial on the libel count. The lower court denied the former, but granted the latter. An appeal from the order denying judgment n.o.v. is specifically permitted by the Act of April 9, 1925, P. L. 221, 12 P.S. §682.

The Act of April 9, 1925, supra, was first construed by this Court in *March v. Phila. & West Chester Trac. Co.*, 285 Pa. 413, 132 A. 355 (1926). It was therein held that in reviewing an appeal in cases where a motion for judgment n.o.v. has been denied but a new trial has been awarded, the appellate courts will affirm unless the granting of the new trial was a clear abuse of discretion. Absent such abuse, the issue of the refusal

of judgment n.o.v. would not even be considered. Thus the rules governing appeals from orders which simply grant a new trial were held applicable: See, e.g., *Phillips v. Cowden,* 370 Pa. 288, 88 A. 2d 404 (1952); *Beal v. Reading Company,* 370 Pa. 45, 87 A. 2d 214 (1952); *Regan v. Davis,* 290 Pa. 167, 138 A. 751 (1927); *Pringle v. Smith,* 286 Pa. 152, 133 Atl. 33 (1926). After a careful reading of the statute and review of the cases thus far decided thereunder, we conclude the approach adopted in *March,* supra, thwarts the purpose of the statute.

In the situation at issue, there is no final order or judgment as to the moving party from which an appeal could be taken. Because of the favorable action on its motion for a new trial, the denial of its motion for judgment n.o.v. is an interlocutory order, which would not be appealable absent specific statutory authorization therefor. The purpose of the Act of April 9, 1925, supra, was to provide a statutory right of appeal to the moving party from this interlocutory order, because if it were entitled to judgment n.o.v., this would be determinative of the case, justifying a speedy review of this issue. In this respect, it is analogous to the Act of March 5, 1925, P. L. 23, §1, 12 P.S. §672, whereby questions of jurisdiction, because of their determinative significance, are appealable although interlocutory. Thus, when the moving party appeals pursuant to the Act of April 9, 1925, supra, it is *not* appealing from the favorable grant of a new trial, as the Court indicates in *March,* supra, but it is appealing from the interlocutory decision denying the motion for judgment n.o.v., and the statute so specifically states.

The granting of the new trial and the denial of the judgment n.o.v., should be considered independently of one another. Only the motion denying judgment n.o.v. should be considered when an appeal is taken pursuant

to the Act of April 9, 1925, supra, because the granting of the motion for a new trial is an interlocutory order as to the moving party, for which no statutory right of immediate appeal has been given. Thus, if one skirts the judgment n.o.v. issue, as sanctioned in *March*, supra, the purpose of the statute is emasculated, resulting in a perhaps unwarranted new trial with accompanying expense in money, time and judicial resources. This has been implicitly recognized in several cases: See, e.g., *Kuhler v. Harrison Const. Co.*, 361 Pa. 100, 62 A. 2d 853 (1949) ; *Aland v. P-G Publishing Co.*, 337 Pa. 259, 10 A. 2d 5 (1940) ; *Schroeder Bros., Inc. v. Sabelli*, 156 Pa. Superior Ct. 267, 40 A. 2d 170 (1944) ; *Matevish v. Ramey Boro. School Dist.*, 167 Pa. Superior Ct. 313, 74 A. 2d 797 (1950) ; *Silveus v. Grossman*, 102 Pa. Superior Ct. 365, 156 A. 716 (1931). We therefore abandon the standard of review set forth in *March,* supra, and will proceed to consider directly the merits of the contention of Curtis that it is entitled to judgment n.o.v. on all claims involved.

Was the publication libelous? A libel is a maliciously written or printed publication which tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession: *Volomino v. Messenger Pub. Co.,* 410 Pa. 611, 189 A. 2d 873 (1963) ; *Cosgrove S. & C. Shop, Inc. v. Pane,* 408 Pa. 314, 182 A. 2d 751 (1962) ; *Schnabel v. Meredith,* 378 Pa. 609, 107 A. 2d 860 (1954).

The elements which a plaintiff must prove to recover in an action for libel under the law of Pennsylvania were delineated by statute by the passage of the Act of August 21, 1953, P. L. 1291, §1, 12 P.S. §1584a (Supp. 1970). Among these are the "defamatory character of the communication" and the "recipient's un-

derstanding of its defamatory meaning." Curtis first maintains that the article published was incapable of the interpretation urged by the plaintiff and was not defamatory as a matter of law.

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him:" *Cosgrove S. & C. Shop, Inc. v. Pane*, supra, at 318; *Birl v. Phila. Elec. Co.*, 402 Pa. 297, 303, 167 A. 2d 472 (1960); Restatement of Torts §559 (1938). And "to be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends upon its general tendency to have such an effect. In a particular case it may not do so either [1] because the other's reputation is so hopelessly bad or [2] so unassailable that no words can affect it harmfully, or [3] because of the lack of credibility of the defamer:" Restatement of Torts §559, comment d (1938). See also, *Miller v. Hubbard*, 205 Pa. Superior Ct. 111, 207 A. 2d 913 (1965).

Procedurally, it is the function of the court, in the first instance, to determine whether the communication complained of is capable of a defamatory meaning: *Volomino v. Messenger Pub. Co.*, supra; *Cosgrove S. & C. Shop, Inc. v. Pane*, supra; Restatement of Torts §614 (1) (1938). If the court determines that the statement is capable of a defamatory meaning, it is for the jury to determine whether it was so understood by the recipient: *Kernick v. Dardanell Press*, 428 Pa. 288, 236 A. 2d 191 (1967); *Richwine v. Pgh. Courier Pub. Co., Inc.*, 186 Pa. Superior Ct. 644, 142 A. 2d 416 (1958); Restatement of Torts, §614(2) (1938). The lower court in this case did not err in finding those

passages which it submitted to the jury capable of defamatory meaning.[1]

---

[1] The following passages from the article, with accompanying innuendos, were held by the court, as a matter of law, to be capable of a defamatory meaning, and submitted to the jury for their consideration:

1. "Crime: The Bizarre Case of Lillian Reis".

2. "They Call Me Tiger Lil".

3. "It was a whiskied voice, aged atop shadowed nightclub bar-stools."

4. "They call me Lurid Lil, they call me Tiger Lil, they call me Queen Lil, they call me Luscious Lil, they call me She-Devil, they call me everything but Mother Lil . . . ."

5. "They think I am the personification of evil. They call me a hustler, they call me a murderess, they call me a gun moll."

6. "For Lillian, an itinerant dancer who has been kicking her way through chorus lines since the age of 13, stardom of a sort arrived with her arrest and trial."

7. " 'Oh sure,' he says about Lillian, 'she used to be a beautiful girl, but now she's over the hump. The mileage has got her.' . . . 'Did you ever hear her open her mouth? . . . She swears like a trooper . . . I have to retire when I'm sixty-five, it's the law. But before I do, I'd like to see them put her where she belongs.' "

8. " 'He [Ralph Staino, Jr.] even makes *me* watch my language.' "

9. " 'She would go to the ladies' room, and on the way she would end up in some brawl. Some guy would make a pass at her, and she'd get into a fight with him, or she'd accuse some girl of having eyes for me, and I'd have to go over and haul her out of it.' "

10. "Before the trials opened, a chain of incredible events took place: One witness was fished from the Atlantic Ocean, another witness was severely beaten, and a third—the victim of a dynamite explosion—was scattered over his rooftop. Lillian's trial ended in a hung jury, although all six women on the panel voted against her. The forelady, in fact, cried in disappointment after announcing the jury's inability to reach a verdict."

Innuendo: "Meant to convey that plaintiff was guilty of the above crimes."

11. ". . . he [Richie Blaney] summoned Captain Ferguson to tell him that the 'big touch' was for a half million dollars, that he knew the spot from which the half million had been stolen and that he knew who had stolen it. He also mentioned Lillian's name."

To determine the meaning of an allegedly libelous communication, it must be read in context: Restate-

12. "The late Vincent Blaney, accused burglar, whose body was found in Atlantic Ocean."

> Innuendo: "This caption and photograph were meant to convey to the readers of the magazine that plaintiff, Lillian Reis, was implicated in Vincent Blaney's murder."

13. ". . . Captain Ferguson knew that it was not the most credible sound ever to come from a witness. On the other hand, Ferguson knew that Lillian Reis had suddenly purchased the Celebrity Room for an announced price of $40,000, a strange new display of opulence for a girl who until then had bought sheets and other household furnishings on an installment plan of roughly three dollars per week."

> Innuendo: "Obviously, this was meant to convey to the readers that Lillian Reis Corabi purchased the Celebrity Room with stolen money."

14. "As their first step in breaking the case, Ferguson and his associates began looking for Lillian's boyfriend, Bing Miller."

> Innuendo: "Obviously, this was meant to convey to the readers that Ferguson did in fact break the case, and that Lillian Reis was in fact guilty."

15. "On August 13, 1960, four months after Robert Poulson had signed his confession, two nurses coming off duty at Our Lady of Lourdes Hospital in Camden, N. J., found him staggering in the rear driveway. He had been beaten, stabbed in the back at least half a dozen times and shot in the base of the skull with a small-caliber bullet. An emergency operation kept him alive, but from that moment on he refused to continue as a witness for the prosecution."

> Innuendo: "Obviously, this was meant to convey to the readers that Poulson was assaulted to prevent him from appearing as a witness against plaintiff Lillian Reis Corabi, and that she had something to do with the assault upon him."

16. "Richie Blaney was blown up by dynamite in his car on July 27, 1961. . . . Captain Ferguson, in Los Angeles at the time, told reporters, 'I expected this thing all along. . . . That yellow gang of Staino, Berkery and Reis are responsible for this. I'll take care of them when I get back to Philadelphia. You can put me on record as saying I'll get every last one of them.' "

ment of Torts, §563, comment d (1938). See 95 U. Pa. L. Rev. 98 (1946). And we recognize that our listing of the alleged defamatory material out of context does not accurately represent the impression created by the whole article, and may not do justice to the expressed

17. "The evidence against Lillian was, as a matter of fact, highly circumstantial. With the brothers Blaney dead and Robert Poulson silent, Bing Miller remained as the Commonwealth's only witness to testify that he had direct knowledge of Lillian's participation in the burglary."

Innuendo for both 16 and 17: "This obviously was meant to convey to the readers that there was circumstantial evidence of Lillian's guilt, that she was responsible for the deaths of the Blaney brothers and the assault on Robert Poulson, that they were killed and assaulted in order to dispose of them as witnesses against Lillian Reis Corabi, that Bing Miller did offer direct evidence of plaintiff Lillian Reis Corabi's *participation* in the burglary."

18. "Dynamite blast killed informer Richie Blaney in car near his Philadelphia home."

Innuendo: "This obviously was meant to convey to the readers of the magazine that plaintiff, Lillian Reis, was implicated in Richie Blaney's murder."

19. "There was also a color-television set in the room, another dividend, according to the Commonwealth of Pennsylvania, of the Pottsville burglary. Whether the Commonwealth's charges were true or not, the television set had dispensed its own judgment. The color didn't work."

Innuendo: "This was obviously meant to convey to the readers that the television set was purchased with stolen money and that Lillian Reis Corabi was guilty of burglary, larceny and receiving stolen goods, and that justice had been served since the television set didn't work."

20. ". . . although the finger at that time did not point toward Lillian. It wasn't until six months after the burglary, when Ferguson received a message from Eastern State (Cherry Hill) Penitentiary in Philadelphia, that the trail began to lead up the Pennsylvania Turnpike to Pottsville and back again to the Celebrity Room."

Innuendo: " 'Celebrity Room' obviously refers to plaintiff."

intent of its author, Alfred Aronowitz, in writing the article. He testified, inter alia: "This article, over-all, was sympathetic to Lillian Reis. It was the first time her story had been brought out in such a long, enlarged form." "A title, 'They Call Me Tiger Lil,' of an article, arouses interest and curiosity in the woman of the subject involved." "It doesn't say it's sympathetic and it doesn't say it's unsympathetic. It just says it is a story about Lillian Reis." "I had to sit down and start writing about Lillian Reis. Now, who was Lillian Reis? Well, I had her introduce herself: 'This is what they call me.'" "The intention in all of this summary of the case, of the Pottsville case, which takes a lot of room because there were a lot of details—and it is still very quick, very sparse—it is just to try to summarize the events which had elevated Lillian as a public figure from notoriety in this country." "It never stated that she was guilty." "Anybody who reads this can just—just by reading it, can know that she protests her innocence." "The whole article is more or less a statement of denial of guilt in this crime, by Lillian." "What I am saying is that articles are not written so that somebody says, 'You are guilty,' and somebody else says, 'I'm not guilty,' and that's an article. All you need is this much space for that, and you get no feeling, no emotion and no depth, and you wouldn't have any kind of understanding of the characters. I mean that's the headline; that's not an article. And that's exactly what I was trying to dispel with this article. I was trying to dispel all of the headlines that had been accumulated about Lillian Reis, headlines like 'Mastermind' and '500 G Haul.'" ". . . she was trying to convey to me how she had been persecuted, how they had been calling her all these names. And to me that was the most outstanding thing about introducing her as a figure, as a character, as a public figure in this article."

However, in an action for libel, the liability of the defendant is not dependent upon the intention of the author. Nor does the mere susceptibility of the publication to an interpretation which would render it innocuous conclusively defeat a right of action for libel: *Boyer v. Pitt Publishing Company*, 324 Pa. 154, 188 A. 203 (1936). "The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same significa-tion that other people are likely to attribute to them:" *Boyer v. Pitt Publishing Company*, supra, at 157. See Restatement of Torts, §563, comment c (1938).

We agree with the lower court that the passages set forth in footnote 1, supra, are at least capable of de-famatory meaning, because they are capable of convey-ing to the average reader imputations of involvement in or actual guilt of crimes involving moral turpitude and of immorality on the part of the plaintiff, Lillian Reis Corabi, thereby tending to harm her reputation, lower her in the estimation of the community, and de-ter third parties from associating with her.[2]

Curtis next argues that the court below should have granted its motion for judgment n.o.v. on the libel count because plaintiff failed to show by clear and con-vincing evidence either falsity or actual malice, and that defendant's rights under the First and Fourteenth Amendments to the United States Constitution were thereby violated.

Implicit in this argument are three contentions of law, aside from their application to the facts of this

---

[2] We do not now consider whether all the statements set forth in footnote 1 are actionable per se or whether some are only ac-tionable per quod, requiring averment and proof of special dam-ages. There were no special damages averred in the complaint, and this has not been raised on appeal.

case: (1) Plaintiff must prove "actual malice" on the part of the defendant in publishing the article in order to recover for libel; (2) A prerequisite to a finding of actual malice is falsity, so plaintiff must likewise prove falsity; and (3) Both of these must be proved by "clear and convincing" evidence rather than by a preponderance of the evidence.

These contentions, especially contention (2), assume particular importance in this case because of a tactical decision made by Curtis' counsel at trial. Initially, in answer to plaintiff's amended complaint, Curtis asserted, inter alia, defenses of (1) consent, (2) substantial truth, (3) privileged character of the article because it was a matter of public interest published without malice, (4) privilege of fair and accurate comment on judicial proceedings, and (5) constitutional privilege under the First and Fourteenth Amendments because the publication concerned a public figure and was published without actual malice. After the plaintiff had concluded her case in chief and prior to beginning his case in chief, counsel for Curtis withdrew defenses (2), (3), and (4), supra, relying thereafter solely on the defenses of consent and constitutional privilege. With reference particularly to the withdrawal of the defense of substantial truth, counsel for Curtis claimed that, should the constitutional privilege be applicable, *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S. Ct. 710 (1964), and its progeny placed the burden on plaintiff to prove falsity rather than requiring defendant to prove truth. We do not agree, but such a contention does warrant that we reexamine the bases of some aspects of our law of libel in Pennsylvania in the light of the constitutional limitations placed thereon.

"It is fundamental in Anglo-Saxon jurisprudence that any man accused of wrong-doing is presumed in-

nocent until proved guilty. This is the rule not only in our criminal courts but in the ordinary affairs of life:" *Montgomery v. Dennison*, 363 Pa. 255, n. 2, at 263, 69 A. 2d 520 (1949). Because of this fundamental premise, "in actions for defamation, the general character or reputation of the plaintiff is presumed to be good:" 53 C.J.S. Libel and Slander §210, at 317 (1948); *accord, Klumph v. Dunn*, 66 Pa. 141 (1871); *Chubb v. Gsell*, 34 Pa. 114 (1859).

As one consequence, as a general rule the falsity of defamatory words is presumed: 53 C.J.S. Libel and Slander §217 (1948). See *Hartranft v. Hesser*, 34 Pa. 117 (1859). Nevertheless, although ordinarily in order to be actionable words must be false,[3] falsity[4] is *not* an element of a cause of action for libel in Pennsylvania.[5] Rather the opposite of falsity, truth, is a complete and absolute defense to a civil action for libel: *Schnabel v. Meredeth*, supra; *Kilian v. Doubleday & Co., Inc.*, 367 Pa. 117, 79 A. 2d 657 (1951); Restatement of Torts §582 (1938). See also, *Matson v. Margiotti*, 371 Pa. 188, 88 A. 2d 892 (1952); *Montgomery v. Dennison*, supra; and the Act of April 11, 1901, P. L. 74, §2, 12

---

[3] In fact, Restatement of Torts, §558 (1938) states: "To create liability for defamation there must be an unprivileged publication of false and defamatory matter of another . . . ." *Accord, Harbridge v. Greyhound Lines, Inc.*, 294 F. Supp. 1059 (1969).

[4] Falsity is *not* included within the definition of defamatory. See discussion, supra.

[5] The Act of August 21, 1953, supra, which is a verbatim enactment of Restatement of Torts, §613 (1938), provides in part: "(1) In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised: (a) The defamatory character of the communication; (b) Its publication by the defendant; (c) Its application to the plaintiff; (d) The recipient's understanding of its defamatory meaning; (e) The recipient's understanding of it as intended to be applied to the plaintiff; (f) Special harm resulting to the plaintiff from its publication; (g) Abuse of a conditionally privileged occasion."

450

P.S. 1582. And the burden of proving the same rests upon the defendant:[6] *Montgomery v. Dennison*, supra; *McAndrew v. Scranton Republican Pub. Co.*, 364 Pa. 504, 72 A. 2d 780 (1950) ; 53 C.J.S. Libel and Slander §217; Restatement of Torts §613, comment h (1938). Moreover, it is manifestly the fair thing to place upon the defendant the burden of proving truth: *Montgomery v. Dennison*, supra, n. 2 at 263; 9 Wigmore, Evidence §2486, at 276 (3d ed. 1940). Although not invariably so, it is preferable to place the burden of proof upon the party having in form the affirmative allegation[7] and/or upon the party who presumably has peculiar means of knowledge of the particular fact in issue:[8] See Wigmore, Evidence §2486, supra. For example, in the context of libel, if the written communication accuses plaintiff of being a murderess, a burglar or a prostitute, the defendant knows precisely what particular event he is referring to and the source of his information, whereas the plaintiff, not knowing these

---

[6] The Act of August 21, 1953, supra, again a verbatim enactment of the Restatement of Torts, §613 (1938), provides in part: "(2) In an action for defamation, the defendant has the burden of proving, when the issue is properly raised: (a) The truth of the defamatory communication; (b) The privileged character of the occasion on which it was published; (c) The character of the subject matter of defamatory comment as of public concern."

[7] In *Conroy v. Pittsburgh Times*, 139 Pa. 334, 339, 21 A. 154 (1891), we said: "[U]nless his action is founded on a negative averment, a plaintiff is not in general obliged to prove a negative, and the inconveniences of a departure from this rule are many." As we indicated, falsity is not an element of a cause of action in libel, so the action of libel is *not* founded on the negative averment.

[8] In *Montgomery v. Dennison*, supra, n. 2 at 263, we said: "It is manifestly the fair thing to place upon the defendant the burden of proving the three things which the Restatement casts upon him to prove, for if the statement he made is true and if the occasion was privileged the knowledge of those things are peculiarly within the possession of the man who makes the defamatory statement."

facts, would experience great difficulty in refuting these general charges by showing their falsity.

In summary, therefore, it is perhaps more accurate to say that "any publication, injurious to the social character of another and *not shown to be true,* or to have been justifiably made, is actionable as a false and malicious libel:". *Wood v. Boyle,* 177 Pa. 620, 631, 35 A. 853 (1896) ; *Collins v. Dispatch Pub. Co.,* 152 Pa. 187, 189-190, 25 A. 546 (1893) ; *Barr v. Moore,* 87 Pa. 385, 391 (1878). (Emphasis added.)

Unlike falsity, malice is essential to an action for libel in Pennsylvania: *Neeb v. Hope,* 111 Pa. 145, 2 A. 568 (1886) ; *Barr v. Moore,* supra. See also, Act of April 11, 1901, P. L. 74, §§2, 3, 12 P.S. §§1582, 1583. "In its common acceptation malice means ill-will against a person; but in its legal sense it means a *wrongful* act done intentionally, without just cause or excuse. . . . Legal malice alone is sufficient to support an action:" (Emphasis added.) *Barr v. Moore,* supra, at 393; *accord, Neeb v. Hope,* supra. As a general rule, malice is implied or presumed to exist from the *unprivileged* publication of defamatory words actionable per se: 53 C.J.S. Libel and Slander §76 (1948) ; *accord, Neeb v. Hope,* supra; *Barr v. Moore,* supra.

The basis of the defense of privilege is public policy: See, e.g., *Williams v. Kroger G. & B. Co.,* 337 Pa. 17, 10 A. 2d 8 (1940). That is, "conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation:" *Montgomery v. Philadelphia,* 392 Pa. 178, 181, 140 A. 2d 100 (1958) ; *Rankin v. Phillippe,* 206 Pa. Superior Ct. 27, 31, 211 A. 2d 56 (1965) ; Prosser, The Law of Torts §109, at 796 (3d ed. 1964). "If [the interest thus favored] is one of paramount

importance, considerations of policy may require that the defendant's immunity . . . be absolute, without regard to his purpose or motive, or the reasonableness of his conduct.[9] If it has relatively less weight from a social point of view, the immunity may be qualified, and conditioned upon good motives and reasonable behavior:" Prosser, The Law of Torts §109, at 796 (3d ed. 1964).

Theoretically, privilege constitutes a defense to a cause of action in libel because it negates the presumption of malice, which is essential to the maintenance of the action: Annot., 54 A.L.R. 1143 (1928). If a communication is privileged, no prima facie presumption of malice arises from its publication, but instead, absence of malice is presumed. This is so because, by definition, the communication is published in furtherance of some overriding social interest and is therefore not "wrongful."

Nevertheless, if the privileged occasion is but a qualified one and it be shown that defendant was actuated by malice, the defense of qualified privilege is vitiated: *Bausewine v. Norristown Herald,* 351 Pa. 634, 41 A. 2d 736, *cert. denied,* 326 U.S. 724, 66 S. Ct. 29 (1945). Such malice is inferred, as a matter of law, when the "occasion of privilege" is shown to have been "abused":[10] *Sciandra v. Lynett,* 409 Pa. 595, 187 A. 2d

---

[9] See, e.g., *Greenberg v. Aetna Insurance Co.,* 427 Pa. 511, 235 A. 2d 576 (1967), *cert. denied,* 392 U.S. 907, 88 S. Ct. 2063, *rehearing denied,* 393 U.S. 899, 89 S. Ct. 72 (1968) ; *Montgomery v. Philadelphia,* supra; *Thompson v. McCready,* 194 Pa. 32, 45 A. 78 (1899).

[10] Neither the Act of August 21, 1953, supra, nor the Restatement of Torts refers to "malice" as an element which plaintiff must prove. The reason is that, because of the presumption of malice, discussed supra, malice need not be *proved* by the plaintiff unless a privileged occasion has been established. When such is established, both the Act of August 21, 1953, supra, and the Restatement of Torts require that plaintiff prove the "abuse of [the] con-

586 (1963). And the burden of proving such "abuse" rests upon the plaintiff: *Sciandra v. Lynett,* supra; *McAndrew v. Scranton Republican Pub. Co.,* supra; *Montgomery v. Dennison,* supra.

From the foregoing discussion, it is noted that the theoretical basis of the defense of privilege in no way affected the underlying presumption of the plaintiff's good reputation and resulting presumption of the falsity of the defamatory communication. This does not indicate that privilege is not in any way related to the falsity of the communication. However, any relationship that may exist will be a consequence of the effect of falsity on the privilege rather than vice versa. That is, "if the statement is shown to be true, there is no occasion to resort to the defense of qualified privilege:" 50 Am. Jur. 2d, Libel and Slander, §179, at 682 (1970).

The privilege spawned in *New York Times Co. v. Sullivan,* supra, and elaborated upon in subsequent cases is a qualified privilege, albeit one of constitutional stature. It is of the same genre as that discussed above, although, because of its constitutional stature, not encumbered by all the intricacies related thereto established by prior Pennsylvania case law. And, most importantly, what may constitute an abuse thereof has been declared by the United States Supreme Court. That is, to overcome the constitutional privilege, the plaintiff must prove that the defendant was actuated by "actual malice," i.e., published the communication "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* supra, at 279-280.

The United States Supreme Court has said: "We held in New York Times that a public official might be

---

ditionally privileged occasion." When such "abuse" is proved, "actual malice" is inferred as a matter of law, and the defense of qualified privilege is vitiated.

allowed the civil remedy only if *he establishes that the utterance was false* and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true." (Emphasis added.) *Rosenblatt v. Baer,* 383 U.S. 75, 84, 86 S. Ct. 669, 675 (1966) ; *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S. Ct. 209, 215 (1964). This statement must be read in context, however. "[The] New York Times rule . . . absolutely prohibits punishment of truthful criticism [of public officials] . . . ." *Garrison v. Louisiana,* supra, at 78. But "allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. . . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *New York Times Co. v. Sullivan,* supra, at 279. Thus the New York Times rule grants constitutional protection to even certain false statements concerning public officials and public figures,[11] in order to prevent a system of "self-censorship" imposed by the fear of "libel judgments virtually unlimited in amount" due to the difficulty in proving truth.

Nevertheless, the defendant is not thereby relieved of his burden of proving truth. Rather, should he be unable to prove truth, he has another defense upon which he may rely, the constitutional privilege. He need not assert both of these defenses, but if he asserts

---

[11] As to public figures, see *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S. Ct. 1975 (1967), and *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S. Ct. 1537 (1970).

only the constitutional privilege, he is thereby conceding falsity, because the presumption of falsity remains unrebutted. Plaintiff then only has the burden of proving "knowledge" of the falsity at the time of publication or "reckless disregard" of the truth or falsity, both of which concern conduct of the defendant, which is most relevant to malice.

Therefore, when the United States Supreme Court said that a public official or public figure must establish that the utterance was false, we interpret that to mean that plaintiff must adduce sufficient evidence to rebut any assertion of the defense of truth by the defendant, and neither absolved the defendant from proving truth nor placed a burden on the plaintiff to affirmatively aver and prove falsity. At least as to the burden of proof, it remains the same as the prior libel law of Pennsylvania.[12] *Contra, Goldwater v. Ginzburg,* 414 F. 2d 324 (2d Cir. 1969) ; *Sellers v. Time, Inc.,* 299 F. Supp. 582 (E.D. Pa. 1969).

We realize that under the existing law of Pennsylvania, the defense of truth may be a hazardous risk for a defendant, since if he fails to sustain it, the jury is permitted to find that he has thereby reiterated the defamation. Consequently, this fact may be considered in aggravation of damages: *Will v. Press Pub. Co.,* 309

---

[12] The United States Supreme Court cases are consistent with our interpretation. For example, in *New York Times Co. v. Sullivan,* supra, at 258-259, falsity of the statements was uncontroverted; in *Curtis Publishing Co. v. Butts,* supra, at 137, defendant raised the defense of substantial truth; in *Associated Press v. Walker,* 388 U.S. 130, at 141, 87 S. Ct. 1975 (1967), both the defense of truth and the defense of constitutional privilege were asserted; in *St. Amant v. Thompson,* 390 U.S. 727, 730, 88 S. Ct. 1323 (1968), and *Garrison v. Louisiana,* supra, at 78, the Louisiana courts' determination of falsity was accepted as a given; in *Greenbelt Cooperative Publishing Ass'n v. Bresler,* supra, the communication was held to be incapable of the defamatory meaning attributed to it by the plaintiff.

Pa. 539, 164 A. 621 (1932). This rule hampers unduly the assertion of a defense which could absolve defendant of liability.[13] The defendant is entitled to present an honest defense without being penalized. Therefore, henceforth only where the defense of truth was entered in bad faith without evidence to support it may it be considered in aggravation of damages: See Prosser, The Law of Torts §111, at 826 (3d ed. 1964).

We do not agree, however, that the jury must be instructed that a public-figure plaintiff must prove "actual malice" by "clear and convincing" evidence rather than by a preponderance of the evidence. The United States Supreme Court said in *New York Times Co. v. Sullivan,* supra, at 285-286: "Applying these standards, we consider that the proof presented to show actual malice lacks the *convincing clarity* which the constitutional standard demands, and hence that it would not constitutionally sustain the judgment for respondent under the proper rule of law." (Emphasis added.) While the existence or absence of actual malice is a question of fact for the jury, whether there is sufficient evidence in the case to warrant such a finding by the jury is a question of law for the court and is reviewable on appeal. See *New York Times Co. v. Sullivan,* supra, n. 26 at 285. Thus the United States Supreme Court has said: "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . We must 'make an independent examination of the whole record,' . . . so as to assure ourselves that

---

[13] In the lower record in the case before us, from colloquies between counsel and the lower court, it is evident that this prospect of aggravation of damages permitted by *Will v. Press Pub. Co.,* supra, was a factor prompting defendant not to continue with the defense of truth.

the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co. v. Sullivan,* supra, at 285. Therefore, in these statements, we believe that the United States Supreme Court was not addressing itself to the degree of proof with which the plaintiff must convince the jury but to the standard by which the court must review the evidence adduced to determine its sufficiency to warrant submission of the case to the jury without impairing defendant's constitutional rights.[14] *Contra, Goldwater v. Ginzburg,* supra.

Turning to the facts of the case before us, as we indicated previously, since Curtis withdrew the defense of truth, the falsity of the defamatory imputations claimed by the plaintiff was conceded. In addition, the lower court found, and neither party disputes in this appeal, that the occasion was qualifiedly privileged and that plaintiff Lillian Reis was a "public figure."[15]

---

[14] The Third Circuit Court of Appeals buttresses this interpretation. They said in *Rosenbloom v. Metromedia, Inc.,* 415 F. 2d 892, 897 (1969) : "We think the evidence of the incident lacked both sufficient substance and *clarity* to meet the standard required to show actual malice . . . . We think that the episode described failed to provide evidence of actual malice with the requisite *convincing clarity* to create a jury issue under federal standards." (Emphasis added.) See also, *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 83, 88 S. Ct. 197 (1967) and *New York Times Co. v. Connor,* 365 F. 2d 567, 576 (5th Cir. 1966).

[15] One of the reasons why the requirements are more stringent for a public official or figure to recover in a cause of action for libel is that these individuals have "sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." *Curtis Publishing Co. v. Butts,* supra, at 155. In this case, Miss Reis was interviewed by Red Benson, a well-known Philadelphia personality, on his radio show concerning the article just two days after the article was published, at which time she had an opportunity to and did attempt to refute some of the imputations therein. A transcript of this Red Benson interview is part of the record before us.

Plaintiff, in order to recover, must therefore prove that Curtis published the article with actual malice, i.e., with knowledge that it was false or with reckless disregard of whether it was false or not. Our task is to make an independent examination of the evidence adduced to determine if it was constitutionally sufficient to warrant a finding by the jury of actual malice, and in so doing, the evidence, together with all reasonable inferences therefrom, must be considered in the light most favorable to the verdict winner, here the plaintiff. If it is not sufficient, Curtis is entitled to judgment n.o.v.

The material which the jury found to be legally offensive was printed in the October 26, 1963 issue of the Saturday Evening Post (Post), which was published by the defendant, Curtis Publishing Company. It purported to be the life story of the plaintiff, Lillian Reis. Lillian Reis was a professional entertainer in Philadelphia, who gained widespread public attention after she was charged with having masterminded a large burglary allegedly committed in Pottsville, Pennsylvania, on August 7, 1959.

In February 1963, the Post assigned Alfred G. Aronowitz, a writer who had experience doing profiles, had been a police reporter on the Newark News and was conversant with the entertainment world, to write an article about Lillian Reis. The article was scheduled for publication shortly before her second trial on the burglary charge, which was listed for November.[16]

---

[16] Miss Reis was first tried in September 1961, but the jury disagreed as to her guilt or innocence resulting in a hung jury. Although there is some conflict in the testimony, it is claimed that the second trial was postponed, at least partially, because of the Post article. The second trial in Pottsville was not held until March 1964, five months after the article appeared. At this trial, Miss Reis was convicted of the burglary. Thereafter, a new trial was granted by the court in Pottsville because of the tacit admission

Aronowitz obtained what material he could on the Pottsville burglary and first trial. Thereafter an introduction to Lillian Reis was arranged, and over a period of months he interviewed her at length.[17] Some of these interviews were recorded on tapes.[18] He also interviewed Captain Clarence Ferguson (who had headed the investigation of the burglary), Detective Jesse Stanton of the Pennsylvania State Police (who worked on the investigation), court reporters in Pottsville, people in the Celebrity Room (the night club in Philadel-

rule. That is, when Miss Reis was confronted with the Poulson confession [an alleged cofelon], she made no denial. This evidence was allowed to go to the jury as indicating guilt on Miss Reis' part, which was reversible error. Ultimately, on July 28, 1969, the District Attorney of Schuylkill County petitioned the court for leave to nolle pros. the prosecution against Miss Reis on the ground that he did not have sufficient evidence to convict her.

[17] The fact of consent to the publication of the article was bitterly contested at trial. Miss Reis testified that she did not consent to the publication of the contents of the article, although she did discuss at length her life history, including many details never published before, with the author, Alfred Aronowitz. She said she did this because "Al" was introduced to her as a free lance writer by a reporter from the New York Post, by whom Aronowitz was employed at the time. He offered, after several conversations, to assist her with a book, which she herself was then writing about "her side of the story." Miss Reis admitted that Aronowitz had told her that he had contributed previously an article to the Saturday Evening Post, but she also testified that she thought that he was "free lance" and that anything he wrote about her life and any photographs would be submitted for her advance approval, which was not done. Miss Reis received no compensation for the article. Aronowitz testified that Miss Reis wanted to see and approve what he wrote, but that he told her it was against the rules of the Post, although she could see and approve in advance any book that he might write about her. In the circumstances, the court properly left the issue of consent to the jury's determination, and they apparently found that Miss Reis did *not* consent to the publication of the article.

[18] These were played at trial, and the transcription thereof covers approximately 225 pages of the record.

phia owned by Miss Reis, where she entertained), Ralph Staino, Jr., and John Berkery (who had also been charged with the Pottsville burglary), and Mr. Michael Corabi (Lillian Reis' husband). In addition, Aronowitz obtained voluminous newspaper clippings and other published material on Miss Reis and the other persons involved with the Pottsville burglary. On the basis of this research, Mr. Aronowitz completed a manuscript.

Although the Post had suggested that the article be of standard length, which would be four to five thousand words, Aronowitz had become so involved that the draft submitted was about thirty thousand words. The manuscript was submitted to Mr. William Ewald, a senior editor, whose task it became to cut the manuscript to usable length, while maintaining the emphasis, the balance and the proportion of the article as precisely as possible. Because of the high quality of the manuscript, it was cut to only ten thousand words instead of to the standard. The "cut" article was then read and approved by several other editors of the Post, including Mr. William Emerson (then executive editor and now editor of the Post). A copy also went to the Copy Department for a careful check of the factual information in the piece against all existing documentary so as to verify the verifiable facts. In addition, the cut article was sent to the attorneys for the Post for a routine check, and they rendered an opinion that it was not libelous.

Although a mere failure "to discover . . . misstatements . . . is constitutionally insufficient to show the recklessness that is required for a finding of actual malice" (*New York Times Co. v. Sullivan,* supra, at 288), the foregoing reveals no failure to investigate the information published. In fact, the vast majority of the 89 paragraphs of the article were specifically shown to be based upon the taped interviews with Miss Reis,

testimony at the Pottsville trial, newspaper articles and other designated interviews. In this regard, it has been said that "while verification of the facts remains an important reporting standard, a reporter, without a 'high degree of awareness of their probable falsity,' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution by a public official." *New York Times Co. v. Connor,* supra, at 576. Yet, "reliance upon newspaper articles, books, and campaign literature, and upon accurate reprinting of another's letter are only factors which, with other factors, are probative of whether the publisher of the cumulated material was motivated by actual malice when he caused the full material to be published. Repetition of another's words does not release one of the responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports." *Goldwater v. Ginzburg,* supra, at 337. With this realization, we will review the evidence as to the twenty specific defamatory statements set forth in footnote 1, recognizing that if there is sufficient clear and convincing evidence that any one or any combination of them were published with actual malice, the plaintiff was entitled to have the case go to the jury.

There is little merit in the position that statements 1, 2, 3, 4, 5, 6, 8 and 9 were published with actual malice.

The case of Lillian Reis is indeed unusual and to characterize it as "bizarre," as statement 1 does, did not constitute, as a matter of law, reckless disregard of the truth.

As to statements 2 and 4, there is testimony that Miss Reis objected to "being called Lil or any kind of

Lil." Aronowitz said she made this statement of "what they called her" to him in conversation. Miss Reis admitted that she could not say whether she had made the statement to Aronowitz or not, but she did discuss the matter with him. In the September 21, 1960, issue of the Philadelphia Daily News, she was repeatedly referred to as "Luscious Lil." Miss Reis wrote herself in the manuscript of her autobiography, entitled "The Truth About Lillian Reis," that she was not a "she-devil." Therefore, some people must have referred to her as such. Aronowitz claims that she added the "Mother Lil" herself. In the circumstances, we cannot say that plaintiff adduced clear and convincing evidence that statements 2 and 4 were published with knowledge of their falsity or with reckless disregard for their truth or falsity.

Statement 3 ("It was a whiskied voice, aged atop shadowed nightclub barstools.") was an opinion formed from personal observation and association. There is no evidence, however, that Aronowitz knew this to be false or that it was a reckless disregard for the truth.

Aronowitz claimed he got statement 5 from Miss Reis herself. On deposition, Miss Reis said there was nothing false in the statement, except "I don't recall using the word 'hustler' ". She did admit, however, to always having a "John," i.e., a man keeping her, and that many men gave her money and valuable gifts. Yet at trial she denied ever being called these things. Such evidence is not sufficiently clear and convincing to warrant a finding of actual malice.

Mr. Aronowitz likewise claimed that he got the information contained in statement 6 from Miss Reis. Miss Reis denied the truth of the statement, but the information does appear in the transcript of the tape recording Miss Reis' voice. We therefore cannot say that defendant published this statement with knowl-

edge of its falsity or with reckless disregard of its truth or falsity.

Statement 8 appears in the transcript of a tape recorded interview with Miss Reis, and Aronowitz testified that Miss Reis told him words to that effect. No actual malice in its publication therefore has been shown.

The information contained in statement 9 was received from Mr. Michael Corabi, Miss Reis' husband. Although their marriage had broken up, Mr. Corabi and Miss Reis were still "good friends." There is no evidence that, because of the source, Aronowitz knew the statement was false or inherently improbable nor were there any other obvious reasons to doubt the veracity of Mr. Corabi. See *Goldwater v. Ginzburg,* supra.

Statements 11, 13, 14, 19 and 20 are alleged to impute to Miss Reis guilt of the crime of burglarizing in Pottsville. This is a very serious charge, and we in the legal profession frown upon trying an individual in the media rather than in a court of law. Yet the United States Supreme Court, in the interest of free speech and free press and in recognition of the public's "right to know" about their public officials and figures, has mandated that such is permissible, absent a showing of actual malice, i.e., publication with knowledge of falsity or with reckless disregard for the truth or falsity. When the state has officially accused a person of a crime by instituting a formal indictment, has held one trial which ended in a hung jury and has scheduled another, we will not say that when a member of the media implies that said person is guilty of the crime charged, such publication was made with reckless disregard of its truth or falsity so as to constitute actual malice. This is so even when the formal indictment and the publication differ as to the amount of the money alleged to have been taken in the burglary.

Statement 7 is a quotation attributed to Captain Ferguson, the chief investigator of the Pottsville burglary. Ferguson admitted making the statement, but Miss Reis denied its validity. Aronowitz testified that he was aware that Captain Ferguson had a "fixation" about putting Lillian Reis behind bars. He wanted to illustrate this in the article by this quote. In addition, a jury could find that, by personal observation and association, Aronowitz knew much of this statement to be false. The fact that he made reference to Moby Dick is some evidence that he either knew the statement to be false or was aware of its probable falsity. In the circumstances, the evidence could warrant a finding of actual malice.

We need not base our affirming of the lower court's denial of defendant's motion for judgment n.o.v. on the libel count, however, on statement 7. Statements 10, 12, 15, 16, 17 and 18 provide an independent and sufficient basis for a finding of actual malice. These statements, along with the pictures accompanying statements 12 and 18, impute guilt or involvement in the assault on Robert Poulson and the murders of Vincent and Richie Blaney.

It is undisputed that prior to the first Pottsville trial, Poulson, one of the alleged burglars, was beaten, stabbed and shot, and thereafter refused to continue as a witness; that Vincent Blaney, another of the alleged burglars, disappeared on August 3, 1960, was shot in the back of the head with a small-caliber bullet and what remained was pulled out of the sea off Atlantic City, New Jersey; and that Richie Blaney, the informer, was blown up by dynamite in his car on July 27, 1961.[19]

---

[19] Poulson and Vincent Blaney had signed confessions. Poulson was convicted of the Pottsville burglary on March 24, 1961. John Berkery and Ralph Staino, Jr., two of the other suspects, were convicted on May 9, 1961.

Miss Reis has been indicted for the murder of Vincent Blaney, but the indictment was quashed when the alleged eyewitness, a subsequent mental patient, admitted his story was a fabrication. She had, in addition, been questioned about the murder of Richie Blaney, but she had been cleared, there being insufficient evidence to even warrant indictment. Captain Ferguson testified that Poulson had revealed to him the individual or individuals responsible for shooting and stabbing him, and that "Lillian Reis didn't have anything to do with it." In fact, Captain Ferguson had testified at Miss Reis' first trial that there was insufficient evidence of her involvement in either of the murders or the assault. Even more importantly, Mr. Aronowitz testified that he was aware that Captain Ferguson, who had a "fixation" to put Miss Reis in jail, had testified as to her noninvolvement.

The information contained in these particular passages was not "hot news", for which the "need for constitutional protection . . . is much more apparent than in the cases of the so-called documentaries or feature stories where time is available to attempt to verify questionable material." *Rosenbloom v. Metromedia, Inc.,* supra, at 895-896. See also, *Curtis Publishing Co. v. Butts,* supra, at 158-159. These events had occurred more than two years prior to the publication of the Post article.

Aronowitz testified he told the editors of the Post that Captain Ferguson had a fixation to put Miss Reis in jail and that he, Aronowitz, thought there "really was a doubt as to her guilt" of even the Pottsville burglary. In the circumstances, the court en banc below found: "When we compare the original manuscript of Aronowitz with the final syndicated version which was printed by the Post, it is not difficult to understand the substantial verdicts awarded by the jury. Al-

though some of Reis' life history, most of it pertaining to her youth and her personal affairs, are fairly presented, the jury found no difficulty in arriving at the final conclusion . . . that the article was clearly pieced together from the original manuscript of Aronowitz in such a manner as to be clearly defamatory." We cannot say that such a conclusion is unsupported by the record. While we recognize the difficulty of the task of reducing a 30,000 word manuscript to a 10,000 word article and still retain all the essential thoughts, the passages selected for deletion and modification, even though sometimes small, can cause a dramatic change in the impression which the final article will generate in the minds of the average reader. And these editing decisions are calculated ones made by the editors to comport with the tone of the magazine desired.[20]

Although the advertisements[21] about the Post article are not a part of the libel alleged, they do constitute some additional evidence that the Post published the article with "actual malice." The advertisements for the issue in question, which appeared in each of the Philadelphia newspapers on October 22, 1963, state, in-

[20] It is not clear whether the Post had a concerted policy of "sophisticated muck-raking" at the time of publication of this article. Curtis, without explanation, failed to produce Clay Blair, the Post's editor at the time the article was written. Instead Curtis produced its editor at the time of trial, William Emerson. Emerson testified that he "never heard any official word of a new policy within the Saturday Evening Post" with respect to sophisticated muck-raking, but had read about it in Newsweek. Emerson also claimed that Blair told him he had been misquoted on the subject.

[21] Although the degree of control that Curtis Publishing Co. could exercise over Curtis Circulation (which was responsible for the advertisements) is not clear, Mr. Emerson testified that Curtis Circulation was "a separate company under the umbrella of the corporation." On page 6 of Curtis Publishing Co.'s 1967 Annual Report, Curtis Circulation is described as a "wholly-owned and profitable subsidiary."

ter alia: "Shortly before Tiger Lil stood trial in 1961, one witness was fished out of the Atlantic, one was half beaten to death, and one was blown to bits with dynamite. Result: a hung jury. But Captain Ferguson of Philadelphia Police is determined to get Lillian Reis, as you will see in this week's Post. . . . Did Lil organize the famous Rich robbery in 1960? Why did Rich claim that only $3500 was stolen, instead of half a million? All the evidence available in this bizarre story of a *modern underworld queen* is summarized in 'They Call Me Tiger Lil.' Don't miss it in the October 26 Post, now on sale at all newsstands for the special price of only 10¢." (Emphasis added.) The circulation staff was apparently independent of the editorial staff, and the circulation staff presumably prepared their advertisements from reading the article, which at the time would have been at press. Even if Curtis Circulation were completely independent, the editors of Curtis Publishing Company would at least have known before the issue "hit the streets" that an independent circulation staff had interpreted the article as imputing to Miss Reis the commission of the murders and the assault. If Curtis Circulation were not independent, Curtis Publishing Co. could have controlled their actions and did not, and therefore must have sanctioned them. In both events, they knew the imputations to be false or, at the very least, "entertained serious doubts as to [their] truth." *St. Amant v. Thompson,* supra, at 731. Yet they condoned and capitalized on this exploitation of the present plaintiff, to her serious detriment. Such use of calculated falsehood is without the pale of the constitutional privilege given to the media as to public officials and figures, and is sufficient evidence to warrant a jury in finding "actual malice," i.e., publication with knowledge of falsity or with reckless disregard for the truth or falsity.

We believe that this case illustrates why a plaintiff, even a public official or public-figure plaintiff, ought *not* to have to prove falsity to vindicate his or her reputation in a libel suit. To require such a burden in this case would have meant that Miss Reis would have had to adduce clear and convincing evidence that she did *not* commit the murders and assault imputed to her, as well as actual malice. Such is practically the opposite of what would occur at a criminal trial, and the rule ought not to be different when one is charged with a crime by a member of the media. Common decency would seem to require that the defaming defendant have the burden of substantiating the accusations, especially when, in many instances, a defamed but innocent plaintiff may not be able to adduce more evidence than a denial that he or she committed the offense charged.

We do not believe the United States Supreme Court has yet mandated, in reference to the constitutional privilege given to the media as to public officials and figures, whether the plaintiff must prove falsity or the defendant must prove truth.[22] We therefore felt compelled, at some length, at the beginning of this opinion, to indicate that the theory and purposes of the consti-

---

[22] With all due deference to and respect for the very learned Second Circuit Court of Appeals, we do *not* believe that the paragraph of *New York Times Co. v. Sullivan*, supra, at 271, referred to in *Goldwater v. Ginzburg*, supra, mandates that plaintiff prove falsity. We interpret that paragraph and *Speiser v. Randall*, 357 U.S. 513, 78 S. Ct. 1332 (1958), as condemning the fact that the requiring of a defendant to prove truth, in some instances, can dampen the exercise of constitutional rights. However, the solution of the United States Supreme Court to this problem, at least in *New York Times Co. v. Sullivan*, supra, was *not* to shift the burden of proof of falsity to plaintiff, but to create the constitutional privilege itself, i.e., the New York Times doctrine, so as to protect *false* communications about public officials, absent actual malice.

tutional privilege are not hampered by continuing to place the burden on defendant to prove truth in every case, not only when the defamatory communication charges or imputes commission of a crime. However, the fairness and wisdom of such a rule are illustrated by the facts of this case, where criminal imputations are involved.

Hence, we conclude the lower court correctly overruled the motion of Curtis for judgment n.o.v. as to the claim of Lillian Reis Corabi for libel, and now turn to the question of whether the court erred in not granting the motion for judgment notwithstanding the verdict awarding damages to Barbara and Michael Corabi for "the invasion of privacy."

In the magazine article involved, Barbara and Michael Corabi were mentioned as the children born of Lillian's marriage. Their ages were given; and, a photograph taken with consent on a public beach was included. Nothing false or offensive was said. It is claimed that they have a cause of action for invasion of privacy, because they were publicly identified as the children of a woman to whom the article imputed guilt or involvement in several serious crimes. We are not so persuaded.

As we point out later on in this opinion in connection with one of the appeals filed by the plaintiff, a public figure, such as Lillian Reis Corabi, has no exclusive rights to her own life's story and cannot claim an invasion of privacy if a biography thereof is published. Another may legitimately publish such a biography with or without consent and include therein the names of the members of the subject's family. See Restatement (Second) Torts, §652F, comment (g) (Tent. Draft No. 13, 1967). Cf. also, *Aquino v. Bulletin Co.*, 190 Pa. Superior Ct. 528, 154 A. 2d 422 (1959). Hence, the claims of Barbara and Michael Corabi cannot be

sustained, and judgment n.o.v. in favor of Curtis should have been entered below.

### APPEALS OF LILLIAN REIS CORABI
### (Nos. 499 and 529)

In these appeals the plaintiff assigns as error the action of the court below (1) in entering judgment notwithstanding the verdict on her claim for unfair competition; and (2) in awarding a new trial on the libel count.

As to the claim for unfair competition, the plaintiff in substance asserts that she acquired a valuable property right in licensing the good will and commercial value of the name, Lillian Reis, her photographs and private history for future publicity and profit, and that the defamatory article involved interfered with and damaged this right.

The wrong the plaintiff asserts in this regard has never been recognized in Pennsylvania as encompassed within a cause of action for unfair competition. See *Pottstown Daily News v. Pottstown Broadcasting Co.*, 411 Pa. 383, 192 A. 2d 657 (1963); *Goebel Brewing Co. v. Esslingers, Inc.*, 373 Pa. 334, 95 A. 2d 523 (1953); and *Waring v. WDAS Broadcasting Station*, 327 Pa. 433, 194 A. 631 (1937). However, it is argued that this claim is really a form of action for invasion of privacy. The facets of such a cause of action have only recently been set forth in Restatement (Second), Torts, §652A (Tent. Draft No. 13, 1967).

Most relevant to this position is §652C, which provides: "One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." However, comment (a) thereto discloses why §652C is not apposite. It states: "The interest protected by the rule stated in this Section is the interest of the individual

in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as such use may be of benefit to him or others. Although the protection of his personal feelings against mental distress is an important factor leading to a recognition of the rule, the right created by it is in the nature of a property right, for the exercise of which an exclusive license may be given to a third person, which will entitle such a licensee to maintain an action to protect it . . . ."

The flaw in plaintiff's position is that a public figure has no exclusive rights to his or her own life story, and others need no consent or permission of the subject to write a biography of a celebrity.[23] *Rosemont Enterprises, Inc. v. Random House, Inc.*, 58 Misc. 2d 1, 294 N.Y.S. 2d 122 (1968). Such life story of the public figure "may legitimately extend, to some reasonable degree, to . . . information concerning the individual, and to facts about him, which are not public, and which, in the case of one who had not become a public figure, would be regarded as an invasion of his *purely* private life. Thus the life history of one accused of [crime], together with such heretofore private facts as may throw some light upon what kind of person he is, his possible guilt or innocence, or his reasons for committing the crime, are a matter of legitimate public interest": Restatement (Second), Torts, §652F, comment (f) (Tent. Draft No. 13, 1967). See *Jenkins v. Dell*

---

[23] It has long been settled that a public figure could not recover for truthful accounts of his life: *Sidis v. F-R Pub. Corp.*, 113 F. 2d 806 (2d Cir. 1940) ; *Chaplin v. National Broadcasting Co.*, 15 F.R.D. 134 (S.D. N.Y. 1953) ; *Estate of Hemingway v. Random House, Inc.*, 49 Misc. 2d 726, 268 N.Y.S. 2d 531, *affirmed*, 25 App. Div. 2d 719, 269 N.Y.S. 2d 366 (1966) ; *Jeffries v. New York Evening Journal*, 67 Misc. 570, 124 N.Y. Supp. 780 (1910). *Time, Inc. v. Hill*, 385 U.S. 374, 87 S. Ct. 534 (1967) has extended this to even false accounts.

*Pub. Co.,* 143 F. Supp. 952 (W.D. Pa. 1956), *affirmed,* 251 F. 2d 447 (3d Cir. 1958). "[Such information also] may, to some reasonable extent, include the members of his family, or even others who have been closely associated with him, although there is nothing else about such persons to attract public attention": Restatement (Second), Torts, §652F, comment (g) (Tent. Draft No. 13, 1967). See also, *Jenkins v. Dell Publ. Co.,* supra; *Aquino v. Bulletin Co.,* supra.

Of course, §652C is concerned only with appropriation of *name* or *likeness.* Yet, it would be a blatant inconsistency to deny a public figure the exclusive right to his life story, yet deny the unauthorized biographer the use of the public figure's name or likeness in his publication without the consent of the public figure. Therefore, the protection given by §652C had been limited by comment (a) to those instances where one can give an exclusive license to another, excluding, inter alia, names or likeness of public figures appearing in their biographies.

Plaintiff therefore may not recover under §652C, and for any injury she may have sustained as a result of the falsity of some facts about her, she will be compensated in the libel count. The court below, therefore, correctly ruled that there could be no recovery on the count claiming unfair competition by the plaintiff, Lillian Reis Corabi.

Nor will we reverse the lower court's action awarding a new trial on the libel count (if the plaintiff did not file a remittitur) on the ground that the jury's verdict was excessive.[24]

The granting of or the refusal of a new trial on the ground of excessiveness is peculiarly within the discretion of the trial court, and will not be interfered with

---

[24] On this count, the jury awarded the plaintiff $250,000 compensatory damages and $500,000 punitive damages.

on appeal unless the record discloses a clear abuse thereof. *Connolly v. Phila. Transportation Co.*, 420 Pa. 280, 216 A. 2d 60 (1966). Our study of the record is persuasive that no such an abuse is evident here.

The damages to be given for libel are not susceptible of precise measurement. Some general and guiding principles are set forth in the Restatement, Torts §§621-623 (1938). See also, *Montgomery v. Dennison*, supra; and *Miller v. Hubbard*, supra. General damages[25] are given to compensate the plaintiff for harm for which the defamatory statement is assumed to have caused his or her reputation. See Restatement, Torts, §622 (1938). Hence, in determining what injury has been done to the plaintiff's reputation, the jury may consider, inter alia, the character and previous general standing of the plaintiff in the community. See Restatement, Torts, §621, comment (c) (1938). And, if that reputation is already bad, evidence of this fact is admissible and should be considered in mitigation of damages. For the same purpose, proof that the defendant was merely repeating what others have said is also admissible. Prosser, Torts, §111 at 828 (1964). See also, *Bausewine v. Norristown Herald*, supra; 53 C.J.S., Libel and Slander §267 (1948); and Restatement, Torts, §621, comment (b) (1938).

In the instant case, while the record does not reveal that prior to the date of the publication involved, the plaintiff's reputation was worthless, it does show that her reputation was substantially tarnished. Under the circumstances, we will not say that the court below was guilty of a clear abuse of discretion in concluding the damages were grossly excessive.

---

[25] As indicated before, we are considering that the libelous statements were actionable per se, for which no special damages need be shown, because the court below and the parties themselves proceeded on this basis.

In sum: (1) The order of the court below denying judgment n.o.v. on the libel count of Lillian Reis Corabi is affirmed.

(2) The order of the court below awarding a new trial on the aforesaid libel count is affirmed.

. (3) The order of the court below denying judgment n.o.v. on the claims of Barbara and Michael Corabi is reversed, and judgments are here entered for the defendant.

(4) The order of the court below entering judgment n.o.v. on the claim of Lillian Reis Corabi for unfair competition is affirmed.

It is so ordered.

Mr. Justice ROBERTS concurs in the result reached by the majority, except that he dissents from the granting of the new trial, believing that Lillian Corabi is entitled to judgment on the jury verdict as remitted. See *Corabi v. Curtis Publishing Co.*, 437 Pa. 143, 154, 262 A. 2d 665, 670 (1970) (dissenting opinion).

Mr. Justice COHEN took no part in the decision of this case.