Max GORDON and Anna Gordon, his
wife and Frances Shusterman

v.

RANDOM HOUSE, INC.

Civ. A. No. 71–2100.

United States District Court,
E. D. Pennsylvania.

Oct. 25, 1972.

920

Benjamin Paul, Philadelphia, Pa., for plaintiffs.

Ira P. Tiger, Philadelphia, Pa., for defendant.

OPINION

BECHTLE, District Judge.

This is a diversity action for damages in excess of half a million dollars brought by Max Gordon, his wife, and married daughter, based on alleged libel and invasion of privacy under Pennsylvania law stemming from the publication by Random House, Inc. in April of 1971 of a book entitled: "The Negroes and the Jews," written by Lenora E. Berson, a Philadelphia author.[1]

For the purposes of this action, the focal point of the book is the opening chapter, entitled "A Prologue: A Tale of Two Cities."[2] The Prologue consists of but nine printed pages, the greater part of which is devoted to a brief history of Max Gordon[3] and his involvement in the North Philadelphia Riots of 1964 which spread to the 900 block of North Marshall Street. It establishes that he is a Jewish retailer selling merchandise to black customers in an area ravished by a black riot. It starts out with mentioning the two-night riot in the latter part of August of 1964, and informs the reader that the arrival of the would-be looters at Max Gordon's store reminded him of a pogrom[4] in his native Russia. It recounts how Max Gordon, after having survived two of them in Russian Ukraine, came to this country in 1931 via Cuba and landed in Philadelphia with six dollars in his pocket. Over a

1. Mrs. Berson, the wife of Pennsylvania Democratic State Representative Norman Berson, has not been made a party to this action. The publisher is the sole defendant.

2. Random House, on the inside jacket of the book, has summarized Mrs. Berson's work as being: "The story of the historic alliance of the two groups . . . and the hostility that has grown between them in the last decades."

3. The author evidently selected or singled out Max Gordon as a principal figure because his involvement in the 1964 riot was reported by *The Philadelphia Inquirer* in a lead article in its Monday morning August 31, 1964, edition, which reached the newsstands less than twenty-four hours after the event occurred. He had telephoned the newspaper on Sunday, the day after the riot, and related to a reporter the details of the attempted looting of his store, which he prevented. His motive in calling the *Inquirer* was to muster public sympathy so as to bring pressure on the police to assign additional men to protect his neighborhood from further looting and destruction (Testimony of Max Gordon at his deposition, pp. 41–42).

4. A "pogrom" means an organized massacre and looting of helpless people usually with the connivance of officials; *specifically:* such a massacre of Jews. Webster's Third New International Dictionary, Unabridged (1971).

period of four years, he worked in a mill that made stockings before he became a jobber. In the next years, the Prologue states, he sold wares from a push cart and then bought a store front property on North Marshall Street where he sold ladies' garments. It discloses that his store is dead center of the strip that thirty-five years ago was the mercantile heart of Jewish Philadelphia. And, even though the neighborhood which was formerly all white is now inhabited by Puerto Rican and colored, he has decided to stay in business there. It reveals that in the black metropolises that are forming in the core areas of all the great American cities "it is the Max Gordons and their younger, more Americanized co-religionists that form the business infra-structure. It is the Jewish merchant, grocer and landlord who has become the face of white urban America."

Then the Prologue suddenly introduces the reader to "Earl," an itinerant black high school dropout from the Harlem ghetto. The author, relating views and beliefs of Earl, tells us:

" 'Nobody wants to give you a job if you've got a record. And if you do get one, it's a racket.' But then everything in Earl's life was 'a racket' or 'a gyp.' He was a 'victim' of the white world and 'the Jew business.' Angrily he pointed to grocery stores with Jewish names that he claimed sold rotten food, to stores that he swore sold cheap clothes at high prices, to Jewish-run bars and to a Jewish real estate office. 'You want to know why we hate Jews? I'll tell you why. When I was born the doctor was a Jew. The white teacher was a Jew. The landlord is a Jew. The grocer is a Jew. The man who gives credit at the store is a Jew. The man who takes back what you bought when you can't make the gyp payments is a Jew. The man at the employment agency is a Jew. The man who hires you is a Jew, and the man who fires you as soon as you finish paying the commission to the other Jew for getting you the job is a Jew. Then some Jew wants to take you to lunch because it's Brotherhood Week. You know all those Jews in the civil rights marches and going down south—you know why they do it? They do it to take the heat off themselves. They've got a bad conscience because they live on black dollars. We had the riots because of the Jews.' "

In the next to the last paragraph of the Prologue, the author states, after pointing out that "the relationship between the Negroes and the Jews is not limited to the cruel juxtaposition of buyer and seller," "as allies they are at the core of the liberal movement in the United States. As antagonists they may well hasten the nation down the bloody road of racism and reaction."

The complaint, filed June 15, 1971 in the United States District Court for the Southern District of New York and then transferred here, consists of 24 paragraphs in three counts. Count I (paragraphs 1 to 14) contains the allegations of Max Gordon's claim; Count II (paragraphs 15 to 19) contains those of his wife, Anna; and Count III (paragraphs 20 to 24) embodies those of their married daughter, Mrs. Frances Shusterman. Max Gordon specifically avers in paragraph 8 of Count I of the complaint:

The foregoing book and prologue thereof was meant and intended to convey that the plaintiff [Max Gordon] was a victimizing and unscrupulous Jew who takes advantage of Negroes by shoddy credit and retail practices; and is one of those people who is responsible for the riots in the cities of this country in the black ghetto areas; and has treated his Ukrainian customers with contempt; and is also guilty of conduct unbecoming a decent merchant and citizen of this country; and further, to hold the plaintiff in contempt in the eyes of

his customers and the neighborhood in which his business is situate.[5]

Random House has filed a motion, now before us for disposition, for summary judgment in its favor with respect to all claims asserted by all plaintiffs in this case. The grounds for the motion are: "(1) the alleged defamatory utterances forming the basis of the instant actions involved matters of public and general concern and were published without either knowing, or reckless, falsity, and; (2) the utterances were not defamatory of plaintiffs, were not capable of a defamatory meaning as to them and did not invade their privacy."

## I.

### A. *Was Max Gordon defamed?*

I shall answer the second ground in part first: Under Pennsylvania law, which is to be applied here, it is the function of the court, in the first instance, to determine whether the communication complained of *is capable of* a defamatory meaning. If the court determines that the communication is *capable* of a defamatory meaning, it is for the jury to determine whether it was so understood by the recipient. See Corabi v. Curtis Publishing Company, 441 Pa. 432, 442, 273 A.2d 899, 904 (1971). On the definition of "libel" this same case tells us:

A libel is a maliciously written or printed publication which tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession: Volomino v. Messenger Pub. Co., 410 Pa. 611, 189 A.2d 873 (1963); Cosgrove Studio & Camera Shop, Inc. v. Pane, 408 Pa. 314, 182 A.2d 751 (1962); Schnabel v.

Meredith, 378 Pa. 609, 107 A.2d 860 (1954) . . .

. . . And, "to be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing with him. Its character depends upon its general tendency to have such an effect . ." 441 Pa., at 441–442, 273 A.2d, at 904.

. . . the mere susceptibility of the publication to an interpretation which would render it innocuous [will not] conclusively defeat a right of action for libel: Boyer v. Pitt Publishing Company, 324 Pa. 154, 188 A. 203 (1936). "The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them:" Boyer v. Pitt Publishing Company, supra, at 157, 188 A. at 204. See Restatement of Torts, § 563, comment c (1938). 441 Pa. 447, 273 A.2d at 907.

The views and beliefs attributed to Earl in the Prologue have a tendency to defame a *class* of people.[6] Plaintiffs agree that, except for the possible use of the word "Ukies" and even assuming that there are Jewish merchants in black ghetto areas gyping and victimizing blacks, and that Earl's defamatory statements were not fabricated, the purported interview of Max Gordon by itself is not defamatory of Max Gordon himself or any member of his family. The gist of their complaint is that the author's placing the purported interview of Max Gordon and the inter-

---

5. In paragraphs 18 and 23 the allegations of paragraph 8 are repeated verbatim with the insertions of the words, "the wife of" between the words, "was" and "a victimizing and unscrupulous Jew . . ." in paragraph 18, and with the insertion of the words, "the daughter of" in the same place in paragraph 23.

6. Defamation of a large class or group is not per se actionable by a member thereof. Schonek v. W.J.A.C., Inc., 436 Pa. 78, 258 A.2d 504, 507 (1969); 22 P.L.E., Libel and Slander, § 17.

view of Earl in proximity to each other conveys the impression, or causes the reader to understand that, Max Gordon and his family are examples of the people who Earl is talking about. From my reading of the Prologue, I think the matter, taken in its entirety, is capable of a defamatory meaning as to Max Gordon. Therefore, there is an issue of fact as to whether it was defamatory as to him.

■ The truth of the statements made by Earl is not self evident, and Random House has not accompanied its motion with any affidavits to establish the truth of the words tending to be defamatory. Therefore, on this motion, I must presume that they are false. See Corabi v. Curtis Publishing Co., *supra*, 441 Pa. at 448–450, 273 A.2d at 908.

B. *Was the wife or daughter of Max Gordon defamed?*

■ I cannot with reason conclude that the Prologue has a tendency to defame either the wife or daughter of Max Gordon. The only references to either of them appears on pages 5 to 16 respec-·tively of the Prologue in the quoted words attributed to Max Gordon as follows: "I bought the building [917 North Marshall Street] too. My wife and I and my kids lived upstairs." and "From this store I sent my son to college, and my daughters married all right —they all live in nice houses in nice Jewish neighborhoods. One daughter always asks me why I don't leave." Therefore, Random House is entitled to summary judgment as to the libel claims in Counts II and III of the complaint.[7]

## II.

A. *Defamation of a public official.*

■ Prior to the landmark decision in New York Times Company v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.

Ed.2d 686 (1964), there were no articulated limitations on state libel laws as to conditional or qualified privileges granted publishers of defamatory falsehoods by reason of the constitutional guarantee of freedom of speech and of the press. The Supreme Court announced in that case that before a "public official" could recover damages in a civil libel action against a newspaper for an alleged defamatory falsehood relating to his official conduct, those guaranties required proof of convincing clarity that the defamatory falsehood was published "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 280, 285–286, 84 S.Ct. at 726, 729. Max Gordon was not a "public official." Random House does not contend, and there is nothing in the record to support a finding, that Max Gordon was a "public official."

B. *Was Max Gordon a "public figure?"*

■ In subsequent cases the rule or limitation announced in the New York Times case was required when the plaintiff turned out to be a "public figure" as opposed to a "public official." See, for example, Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1967). There, plaintiff, said to have been involved in a "fix" of a college football game, was an athletic director of the University of Georgia and a former well-known football coach. Assuming that Max Gordon was a "public figure" in 1964 by reason of his name having appeared in a *Philadelphia Inquirer* lead article on the riot, I think there is a genuine issue of fact as to whether he continued to be such a figure or reverted to being a private individual when the book was published in the latter part of April of 1971, six years and eight months after the riot.

7. A Pennsylvania Common Pleas Court has held, in a case in which two young sons of an allegedly defamed father sued for libel and slander, that in the absence of defamation directed to the sons them-selves, they have no cause of action for libel or slander of the father. See Redding v. Dun & Bradstreet, Inc., 47 Pa. Dist. & Co. R.2d 459 (C.P.Phila.Co., 1969).

C. *Was Max Gordon a "private individual" but also the object of a communication involving matters of public or general concern?*

Several weeks after "The Negroes and the Jews" was published, and a week before this action was instituted, the Supreme Court on June 7, 1971, decided Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L. Ed.2d 296, a case involving a claim for libel under Pennsylvania law. The plurality opinion in that case extended the constitutional protection given discussions and communications in libel actions brought by "public officers" and "public figures" to discussions and communications involving matters of public or general concern. The shift in emphasis was from the focus on the public status of the plaintiff to an analysis of whether the discussion or communication involves an event of public or general concern. The rule announced in the Rosenbloom v. Metromedia, Inc. case is that a libel action by a "private individual" against a broadcaster for a defamatory falsehood in a news report relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was broadcast with knowledge that it was false or with reckless disregard of whether it was false or not. 403 U.S. at 51, 91 S.Ct. at 1824. The holding by the plurality was that their independent analysis of the record led them to agree with the Court of Appeals for the Third Circuit "that none of the proofs, considered either singly or cumulatively, satisfies the constitutional standard with the convincing clarity necessary to raise a jury question whether the defamatory falsehoods were broadcast with knowledge that they were false or with reckless disregard of whether they were false or not." 402 U.S. at 55, 91 S.Ct. at 1825.

The involvement of Max Gordon, a Jewish retailer, in an urban riot, one that lasted two nights and in which over 700 business establishments, close to ninety percent owned by Jewish merchants, were broken into, looted and some destroyed, clearly involved him in a matter of legitimate public or general concern. The riot received widespread coverage from the news media. The matter had not ceased to be an event of public or general concern at the time of the publication of the book. The riot was noted in the Report of the National Advisory Commission on Civil Disorders (1967, Bantam ed.), p. 37. From time to time since the riot, studies of the relationship between Jewish merchants and inner-city Negroes have been published. *Time Magazine* devoted a cover story to this subject. See *The Black and the Jews: A Falling Out of Allies*, Time, Vol. 93, No. 5, p. 55 (January 31, 1969).[8] Published writings on these subjects clearly fall within the ambit of the First Amendment protection. See, for example, comment by Mr. Justice White in his concurring opinion in Rosenbloom v. Metromedia, Inc., *supra*, 403 U.S. at 59, 91 S.Ct. at 1827.

8. For other articles and commentary on this relationship, see the following:

*Jews and Blacks: Together Again?*, Christian Century, Vol. 88, p. 1251 (October 27, 1971); Herberg, *The Jew and the Negro*, National Review, Vol. 22, p. 900 (August 25, 1970); *Jewish Vigilantes*, Time, Vol. 94, No. 1, p. 22 (July 4, 1969); Glazer, *Blacks, Jews and the Intellectuals*, Commentary, Vol. 47, No. 4, p. 33 (April 1969); Himmelfarb, *Is American Jewry In Crisis*, Commentary, Vol. 47, No. 3, p. 33 (March 1969); Raab, *The Black Revolution and the Jewish Question*, Commentary, Vol. 47, No. 1, p. 23 (January 1969); *For Better Communications*, Time, Vol. 90, No. 21, p. 72 (November 24, 1967); *SNCC and The Jews*, Newsweek, Vol. 70, No. 9, p. 22 (August 28, 1967); Geltman, *The Negro-Jewish Confrontation*, National Review, Vol. 18, p. 621 (June 28, 1966); Hertz, *Rising Tide of Negro-Jewish Tensions*, Ebony, Vol. 20, No. 2, p. 117 (December 1964); McCormack, *Report from Columbia Avenue*, Philadelphia Magazine, p. 26 (July 1965); and Glazer, *Negroes & Jews; The New Challenge To Pluralism*, Commentary, Vol. 38, No. 6, p. 29 (December 1964).

D. *Assuming Max Gordon was either a "public figure", or a "private figure" involved in a subject of public concern, is there a genuine issue of fact as to defendant's knowledge that the statements it made were false, or made with reckless disregard of their falsity?*

1. *Knowledge of falsity.*

 Random House accompanied its motion for summary judgment with affidavits of both James H. Silberman, Editor-in-Chief and principal officer of Random House, and Mrs. Nan Talese, employed by Random House as Senior Editor. The latter stated in her affidavit that she was the person directly responsible for editing the book, and the only person at Random House with whom the author dealt, and that when the author submitted the manuscript and the Prologue to her, she represented that the factual statements in it concerning Max Gordon were based on an actual interview she had with him, plus information contained in the public press. Silberman stated that Talese reported directly to him. Both of them swore in their affidavits that at the time the book was published, or at any time prior to publication, they had no knowledge or reason to believe that any of the statements contained in the book concerning Max Gordon were false, that no one associated with the publication had any contrary knowledge, that they never met Max Gordon, bear no personal animosity toward him nor to any member of his family, and that to the best of their knowledge no one associated with Random House bore any personal animosity toward him nor to any member of his family or intended to do them any harm. In answer to plaintiffs' interrogatory number 35 seeking to ascertain what financial and contractual terms were entered into between the author and Random House, the latter answered by stating that she was an independent contractor.

Although plaintiffs assert that they will be able to produce direct evidence to show that some of the statements in the Prologue were false, they have produced no opposing affidavits to the above information as required by Federal Rule of Civil Procedure 56(e), beyond the statement made by Max Gordon in his affidavit that to the best of his knowledge, information and belief Random House had reason to believe, prior to publication of the book, the statements therein pertaining to him and his family were false. This conclusory statement is not enough to overcome the force of those produced by Random House. Moreover, plaintiffs' attorney conceded during the course of plaintiffs' depositions that they have no *evidence* that Random House knew in advance of publication that the Prologue contained defamatory falsehood about Max Gordon. Therefore, I must conclude that there is no genuine issue of fact on this point.

2. *Reckless disregard of whether it is false or not.*

 The remaining question is whether there is a genuine issue of fact that Random House published the Prologue with reckless disregard of whether the defamatory statements therein directed against Max Gordon were true or not. In making this determination we do not apply the Pennsylvania common-law negligence test. The " 'cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' St. Amant v. Thompson, 390 U.S. [727], at 731, 88 S.Ct. [1323], at 1325, [20 L.Ed.2d 262]." Rosenbloom v. Metromedia, Inc., *supra,* 403 U.S. at 56, 91 S.Ct at 1826.

Talese, in her affidavit, stated that she had "no doubt as to the veracity of the representations made to her by the author and that she believed them completely." Silberman also swore that he did not have any doubt about the veracity of such statements. On the other hand, Max Gordon swears in his affida-

vit that he never had an interview or any conversation with the authoress prior to publication of the book and that to the best of his knowledge, Random House had doubts concerning the veracity of the statements and that those statements were inherently improbable. Plaintiffs have not offered any other counter-affidavits, indisputable information revealed through discovery or admissions demonstrating that Random House in fact entertained serious doubts as to the truth of the defamatory statements appearing in the book. They rely instead on: (a) the nature of the defamatory statements and the non-existence of "Earl"; and (b) asserted untruths about Max Gordon appearing in the Prologue.

(a) As to the nature of the defamatory statement and the non-existence of Earl.

Plaintiffs point out that in answer to interrogatories propounded by them seeking the date of the interview with "Earl," his address or other means of identification of the place where the conversation took place, Random House stated that it "does not possess the requested information." They argue that although a tragic black anti-Semitism probably existed, it seems highly improbable "that one person could ascribe all the victimizations of him [Earl] as a black ghetto resident to Jews only, and a jury could conclude Earl's comments were inherently improbable and that Random House had obvious reasons to doubt the veracity of the author in reporting the entire incident, and the accuracy of her report." [9] Moreover, plaintiffs argue that in view of the fact that the statements attributed to Earl referred to a class of people which the author identifies plaintiffs as belonging

to, it was extremely reckless of Random House not to make inquiries concerning the actual existence of the purported interview with him.

But, the existence or non-existence of the character named "Earl" has no legal significance here. The repetition of his defamatory statements will not save the repeater from liability merely because they were spoken by a real person. Assuming that the anti-Semitic statements attributed to Earl are really those gathered by the author and then made to appear to be the views and beliefs of a fictionalized spokesman for a particular group of people so as to support her thesis that: "As antagonists they [Negroes and Jews] may well hasten the nation down the bloody road of racism and reaction.",[10] and that Random House should have realized this before it published the book the fact remains that Earl's comments are not inherently improbable. As the increasing amount of consumer protection legislation and executive branch activity stands witness to, merchants, be they Jews or non-Jews, are neither physically nor intellectually incapable of victimizing their customers.

(b) As to the asserted untruths about Max Gordon.

The author stated at her deposition by plaintiffs that she telephoned Max Gordon's number, that she spoke to a man who identified himself as Max Gordon, that she based the statements in the Prologue concerning him on what this man told her over the phone, and what had previously appeared in the newspapers. Max Gordon swears that he was never interviewed by the author prior to publication and from this omission plaintiffs argue that she was recklessly disregardful of the truth,[11] and

---

9. Plaintiffs' Brief, p. 11.

10. *The Negroes and The Jews*, p. 9.

11. Some of the alleged inaccuracies about Max Gordon claimed by plaintiffs to appear in the Prologue are: He was born in Geisen in 1903, not "Czarist Kishiner"; his eyes are brown, not "blue"; he never

earned his living in Russia as a "peddler"; the Red Army did not want to kill him because he was a "Jew capitalist"; when he landed in this country he had $300.00 in his pocket, not "six"; he never sold his wares from a push cart or extended credit to his customers; his store is known as "Gordon's" instead

that such action by this non-party can be imputed to the party defendant, citing the *Corabi* case. These contradictory statements create a credibility issue, but it need not be resolved here. Max Gordon has not indicated that he will be able to offer evidence tending to cast doubt on Random House's statement that the author, in her relationship with the publishing firm, was an independent contractor. Assuming that the author was reckless, her actions may not be imputed to Random House. See Washington Post Company v. Keogh, 125 U.S. App.D.C. 32, 365 F.2d 965, 970 n.6 (C. A.D.C.1966). Moreover, plaintiffs admit in their brief that the statement about Max Gordon, separated from Earl's, is not defamatory.

 Thus, I must conclude that there is no genuine issue of fact as to Random House's knowledge of the falsity or of its reckless disregard of whether it was false or not. Max Gordon is not able to produce evidence which will satisfy the constitutional standard with the convincing clarity necessary to raise a jury question on these issues.

### III.

 Each of the plaintiffs claim damages for invasion of their privacy. The alleged factual basis for their respective claims are identical to those averred as grounds for their libel claims. Invasion of privacy is recognized as an actionable tort in Pennsylvania. Bennett v. Norban, 396 Pa. 94, 151 A.2d 476 (1959), 37 P.L.E., Torts, § 6. However, Random House argues that such an action cannot be maintained by a "public figure," and that Max Gordon "has been a voluntary 'public figure' ever since that Sunday in August of 1964, when he succeeded in his efforts to have the story of his involvement in the 1964 North Philadelphia riot published in the *Inquirer*." I have ruled previously that the issue of whether Max Gordon was still a public figure at the time the book was published is one of fact. Nevertheless, Max Gordon cannot maintain such an action. The plurality opinion in Rosenbloom v. Metromedia, Inc., *supra*, noted at p. 48 [403 U.S.], 1822 [91 S. Ct.]:

"... Traditional arguments suggest that libel law protects two separate interests of the individual: First, his desire to preserve a certain privacy around his personality from unwarranted intrusion, and second, a desire to preserve his public good name and reputation. See Rosenblatt v. Baer, 383 U.S. [75], at 92, 86 S.Ct. [669], at 679 [15 L.Ed.2d 597] (Stewart, J., concurring). The individual's interest in privacy—in preventing unwarranted intrusion upon the private aspects of his life—is not involved in this case, or even in the class of cases under consideration, *since, by hypothesis, the individual is involved in matters of public or general concern*. In the present case, however, petitioner's business reputation is involved, and thus the relevant interests protected by state [Pennsylvania] libel law are petitioner's public reputation and good name. (Footnote omitted.)" (Emphasis Added)

Since Max Gordon's interest in privacy is not involved in this case, he cannot recover damages for any alleged invasion of that interest by Random House. It follows that the similar interest of the other plaintiffs are not involved either. See Frick v. Stevens, 43 Pa.Dist. & Co. R.2d 6, 49 (C.P.Cumb.Co.1967).

Accordingly, defendant, Random House, Inc., is entitled to summary judgment in its favor on each claim under all three counts of the complaint.

---

of "Gordon's Ladies Apparel Shop"; he has only one child, a daughter who went to college for two years before she married and therefore could not have sent his "son to college"; and he never said: "The young people now spend, they don't save. I mean the colored."