## Kodak v. Watson

*Bruce E. Cooper,* for plaintiff.
*Gregory R. Reed,* for defendant.

DOWLING, *J.,* March 8, 1984—It has been said that the two most precious things this side of the grave are our reputations and our lives. As expressed by the immortal Bard:

"Good name in man and woman, dear my lord,
Is the immediate jewel of their souls;
Who steals my purse steals trash; 'tis something,
nothing;
'Twas mine, 'tis his, and has been slave to
thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed."[1]
Expressed more succinctly in an earlier play:
"Thy death-bed is no lesser than the land
Wherein thou liest in reputation, sick."[2]
The final sentence of the Declaration of Independence reads:

"And for the support of this Declaration, with a firm reliance on the Protection of Divine Providence, we mutually pledge to each other our Lives, our Fortunes, and our sacred Honor."

For over a thousand years of English and American legal history, a remedy has existed for attacks on one's good name. To those who consider their reputation as precious as life itself, the writ for an action of defamation is no less important than the great writ of habeas corpus. Justice Stewart, concurring, in Rosenblatt v. Blair, 383 U.S. 75, 92, said:

"The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt, reflects no more than our basic concept of the essential dignity and worth of every human being, 'a concept at the root of any decent system of ordered liberty.' "

While Justice Hugo Black insistently and persistently took the position that the First Amendment completely destroyed the entire American law of

---

1. *Othello,* III. iii.
2. *Richard II,* II. i.

defamation, there was no sound historical basis for his construction, and it has not been followed. To the contrary, at least until The New York Times v. Sullivan,[3] there has been no suggestion that the right to freedom of speech affected the law of defamation. Justice Frankfurter in Beauharnais v. Illinois, 343 U.S. 250, 266, spoke of "libelous utterances as not being within the area of constitutionally protected rights." And as noted in Roth v. United States, 354 U.S. 476, 483 (1957):

". . . It is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this court from concluding that libel utterances are not within the area of constitutionally protected speech."

While these decisions predate The New York Times v. Sullivan, that case, while it effected a profound change in the law of defamation, concerned the issue of privilege as respects a public official, an issue which will be discussed below but which is not now before us.

We are here dealing with defendant's preliminary objections in the nature of a demurrer and, as is universally recognized but frequently ignored, such a pleading admits all relevant facts and all fairly deductible inferences therefrom.

Thus, the factual issue for review discloses that plaintiff Robert D. Kodak is a practicing attorney and also a member of the Board of Supervisors of West Hanover Township. Defendant Andrew J. Watson, a resident of the township, appeared before the board at an open meeting and publically read and presented in writing a statement that he allegedly knew to be false and untrue, and did so mali-

---

3. 376 U.S. 254 (1964).

ciously and with the intent to deprive plaintiff of his good name and reputation. Specifically, defendant alleged that a site development plan "was kept deceitfully quiet until it was dropped like a bomb at the public meeting August 1, 1983," and that this plan:

". . . was maneuvered through the planning commission and other township officials by none other than Robert Kodak, a member of the board of supervisors. One must properly assume that said Robert Kodak will be paid a handsome fee for his services. If indeed the actions of Robert Kodak are not a legal 'conflict of interest' then I think the people of West Hanover Township have a right to have a higher moral leadership from our supervisors. Personally, I think Robert Kodak should resign so that he can ply his trade on the highways and byways as his conscience dictates."

Two issues are raised in the demurrer: whether the statement is capable of a defamatory meaning and whether it is privileged.

It is, of course, the function of the court to determine initially whether the statements complained of are capable of a defamatory meaning. The leading case in Pennsylvania of recent vintage is Corabi v. Curtis Pub. Co., 441 Pa. 432, 442, 447, 273 A.2d 899 (1971), wherein it is stated:

"A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Cosgrove S.&C. Shop Inc. v. Pane, supra, at 318; Birl v. Phila. Elec. Co., 402 Pa. 297, 303, 167 A.2d 472 (1960); Restatement of Torts §559 (1938). And "to be defamatory, it is not necessary that the communication actually cause harm to another's reputation or deter third persons from associating or dealing

with him. Its character depends upon its general tendency to have such an effect. . . .

"However, in an action for libel, the liability of the defendant is not dependent upon the intention of the author. Nor does the mere susceptibility of the publication to an interpretation which would render it innocuous conclusively defeat a right of action for libel: Boyer v. Pitt Publishing Company, 423 Pa. 154, 188 Atl. 203 (1936). 'The test is the effect the article is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate. The words must be given by judges and juries the same signification that other people are likely to attribute to them.' Boyer v. Pitt Publishing Company, supra, at 157. See Restatement of Torts §563, comment c (1938)."

Viewed in the light of these well-established legal principles, it does not require the imagination of a child in the dark to discern the libelous import in stating that a member of the board of supervisors who maneuvered a site development plan through the planning commission "will be paid a handsome fee for his services." To do so would subject Mr. Kodak to disbarment, loss of office and criminal proceedings. Clearly, such a suggestion epitomizes a libelous utterance.

"Any statement which imputes to a practicing lawyer that he . . . has acted dishonestly or corruptly in his dealings with clients, counsels, or judges . . . is slander per se." The Law of Defamation by Laurence H. Eldredge, at 131, 132.

In Pattangill v. Mooers, 113 Me. 412, 94 Atl. 561, 562 (1915), plaintiff lobbied against a bill which was defeated, and defendant accused him of accepting fees from both supporters and opponents of the bill. The court said:

"It cannot be reasonably questioned that Fisher and Adams, to whom the defendant made the slanderous statement complained of, understood from it that the plaintiff had been employed and paid as an attorney for the labor unions to advocate the enactment of the Workmen's Compensation Act, and that he was guilty of most culpable dishonesty towards his employers, and had basely betrayed their trust and confidence in him by accepting a retainer from the opponents of the act and using his influence to defeat it. If slanderous words, whether written or oral, directly tend to the prejudice or injury of one in his profession, trade, or business, they are actionable. And, when the defamatory words spoken have such a relation to the profession or occupation of the plaintiff that they directly tend to injure him in respect to it, or to impair confidence in his character or ability, when, from the nature of the business great confidence must necessarily be reposed, they are actionable, although not applied directly by the speaker to the profession or occupation of plaintiff. 25 Cyc. 328."

A critical point is that the words "touch him in his profession" in a different way than they would "touch a person in any other trade or profession."[4] Thus, it has been said that a statement that plaintiff was drunker than any of the judges at a bar association meeting is not slanderous, but to say that plaintiff was so drunk in court that he could not examine the witnesses competently, may well be.[5] In a recent decision, Dunlap v. Philadelphia Newspapers, Inc., 301 Pa. Super. 223, 448 A.2d 6 (1982), the court, quoting the test for defamation as set

---

4. Doyley v. Roberts, 3 Bing. N.C. 835, 840, 132 Eng.Rep. 632 (1837).

5. Eldredge, Law of Defamation, at 132.

forth in Corabi, supra, commented that a photograph depicting a police officer as accepting a bribe would at the very least injure him in his profession and would be considered defamatory.

Defendant has cited a number of cases, none of which are in point, but we will by way of illustration distinguish what appear to be several containing somewhat similar factual backgrounds. Thus, in Redding v. Carlton, 223 Pa. Super. 136, 296 A.2d 880 (1972), the court upheld a demurrer in a situation where plaintiff had a dual role as a supervisor and a landowner. The alleged defamatory allegation was "this is a conflict of interest at the very least and perhaps much more." In sustaining the demurrer, Judge Hoffman stated at page 140:

"Appellant's dual role as supervisor and landowner is clearly a conflict of interests. Such a conflict may prompt a decision not in the township's best interest, and such action would be criminal. A man confronted by a conflict of interests, however, can act honestly and impartially."

We think this is quite different from the instant case where plaintiff's activities were not only characterized as a conflict of interest, but it was also stated that he would be paid a fee for his services.

In Kernick v. Dardanell Press, 428 Pa. 288, 236 A.2d 191 (1967), a media case, a demurrer was upheld where plaintiff, the township auditor, had made allegations that one of the commissioners had conducted himself in a manner to warrant initiation of criminal prosecution. The district attorney, after an investigation, reported that he found nothing to justify such proceedings. The commissioners then issued a statement indicating that plaintiff had failed to substantiate her outrageous accusation, that her remarks had "carefully calculated to disparage the township and its officials, that her utter-

ances cost the taxpayers money in order to conduct an investigation of her charges even though they consistently turned out to be baseless. . . ." The Supreme Court found nothing libelous in these statements, although it did state in granting the demurrer at page 292:

"If the statement of the commissioners had accused Mrs. Kernick of dishonesty or of incompetence in her work, the situation could have been different."

The last decision is one out of this court, Dininni v. Kelly, 98 Dauph. 140 (1976), where the substance of the allegation was that defendant stated at a public meeting of the Commissioners of Swatara Township:

"Why hold down the real estate taxes on that type of property? This is what you are doing. That property is in Mr. Vanatta's ward and the politician who is the owner of it is in Mr. Sheaffer's ward and I am sure this may have been a pact. According to the records in the Dauphin County Court House, the property that I am referring to is owned by Rudolph Dininni and Dr. Sava Macut."

The thrust of Judge Wickershman's opinion was that defendant did not suggest any form of criminal conduct.

In all of the cases relied upon by defendant, it required the use of the court's imagination to reach a conclusion that the statements were defamatory. In the instant case, no such thought process is necessary. The statements made clearly constitute a straightforward accusation of criminal conduct on the part of plaintiff.

Defendant has prematurely raised the defense of privilege in this case. Pennsylvania Rules of Civil Procedure 1030 and 1045(b) specifically indicate that privilege is an averment of defense and must be

pleaded in "new matter" in an answer to the complaint. Thus, defendant's demurrer on the ground that his comments were privileged and that he is immune from liability cannot be sustained. See Curley v. Lisman, 16 D.&C.3d 233, 235-236 (1980), and the cases cited therein.

It is argued that to not dismiss this complaint will have a chilling effect on the right of citizens to speak out and criticize what they believe to be governmental abuse. But to do so would deter citizens from assuming the responsibilities of local office. The "chill" which the law of defamation casts on certain forms of free speech must not be allowed to freeze aspirations toward public service.

It is interesting that the deepest hell of Dante's Inferno is not a place of fire, but the windy desolation of an ice palace. One whose good name is destroyed and honor lost may well suffer the abject misery of Dante's Satan who, surrounded by a thick fog, half sunk in the frozen vastness of a pit and inaccessible through cold blizzards, stands suspended in space.

Accordingly, we enter the following

## ORDER

And now, this March 8, 1984, defendant's preliminary objections are overruled.